FRANKLIN J. KINSLEY, Respondent, *v.* DOMINICK CARRAVETTA and Another, Defendants, Impleaded with ALEXANDER NICOLL and Another, Appellants.

First Department, April 12, 1935.

· *Francis L. Driscoll* of counsel [*Lorenz J. Brosnan* with him on the brief; attorney], for the appellants.

*Allen B. Flouton* of counsel [*Joseph C. Thomson* with him on the brief; *Franklin J. Kinsley*, attorney], for the respondent.

GLENNON, J. This action is predicated upon the theory of malpractice on the part of the defendants while respondent was a patient in Fordham Hospital, a city institution. At the close of the entire case, without objection on the part of the respondent, a verdict was directed in favor of Drs. Carravetta and Drews. The jury returned a verdict against the appellants.

The defendant Dr. Carravetta was an interne in the hospital and his immediate superior was the defendant Dr. Drews, who was house surgeon. Dr. Nicoll, one of the appellants, was a director of surgery in general charge of a ward, made up of one hundred and fifty beds, which were usually occupied by patients, and wherein respondent was confined from the date of his entrance on November 4 until December 6, 1931. Dr. Kenyon, the other appellant, was an assistant surgeon who specialized in the care and treatment of fractures. The services rendered to the patients of this hospital over a period of a great many years by these two physicians were purely gratuitous.

Respondent on the 4th day of November, 1931, due to a fall, suffered from what has been variously classified as a " sliding " or " spiral " or " torsion " fracture of the tibia and fibula of his right leg. He was removed from the scene of the accident in an ambulance to the hospital where he arrived about two A. M. Upon his admission he had a temperature of 100 and his pulse was 96; his leg was enormously swollen from the knee to the ankle, the soft parts of the leg were badly injured; there was bleeding under the skin, and there were several superficial abrasions which were infected. The fracture was reduced by Dr. Carravetta about ten A. M. During the course of respondent's confinement his temperature continued for about nine days and increased on at least one occasion to 103.4; his pulse went as high as 118, and continued at a rapid rate until the first day of December; he contracted a sore throat and had difficulty in breathing. These symptoms indicated that there was a general infection at some point in his system. The abrasions on his leg did not heal on the surface until November twenty-fourth, and even then " the skin was still reddened and very doubtful of sepsis."

Four sets of X-ray pictures were taken at Fordham. The first on November fourth, the second on November ninth, the third on November thirteenth, and the fourth, November twenty-sixth. It is claimed by the respondent that the third and fourth sets showed that the segments of the bones had slipped somewhat from the position obtained by the setting of the fractures on November fourth. It was not disputed that in a fracture of the type suffered by plaintiff, due to the traumatism that causes the injury and the contraction of the muscles, it is a difficult matter to keep the bones in proper alignment, and slipping frequently occurs.

Apparently it was the contention of the respondent upon the trial that Dr. Kenyon was guilty of malpractice because of his failure to reset the injured leg on the twenty-sixth of November.

However, on November twenty-seventh, Drs. Carravetta and Kenyon examined the patient and noticed that the alignment was good and that there was no evidence of eversion. Kenyon told the plaintiff that as the leg stood he would get a very good functional result, and that time alone would tell if he were correct. Plaintiff expressed a desire to go home at that time, but remained in the hospital, at the suggestion of Dr. Carravetta, until December sixth. Then he was supplied with crutches and advised to return to the " out patient " department. There is no medical history upon which to base a conclusion as to what, if anything, happened between that date and January 28, 1932, when respondent first consulted Dr. Taferner, his family physician. It is claimed that at that time an examination showed that his right leg was " everted, turned out and rotated outward." Subsequently Dr. Taferner advised an open operation and the result was the plaintiff was admitted to the Community Hospital on February fifth, where the operation was performed.

Before setting forth the principles of law which should be applied to a case of this character, it might be well to direct attention to the record which indicates that the issue in so far as Dr. Kenyon was concerned finally narrowed down to one point, and that was " that the sole claim against the defendant Dr. Kenyon relates to a claimed failure to reset the injured leg on the 26th day of November." Although counsel for the plaintiff consented to a charge as thus framed by counsel for Kenyon, the court nevertheless refused to charge as requested. We refer to this instance, not by way of criticism, but simply to indicate the theory upon which respondent expected to obtain a recovery.

We are inclined to the view that the court erred in submitting this case to the jury. We base our opinion upon the facts contained in the record and the principles of law which should have been applied in a case of this type. In *Pike* v. *Honsinger* (155 N. Y. 201) Judge VANN said: " The law relating to malpractice is simple and well settled, although not always easy of application. A physician and surgeon, by taking charge of a case, impliedly represents that he possesses, and the law places upon him the duty of possessing, that reasonable degree of learning and skill that is ordinarily possessed by physicians and surgeons in the locality where he practices, and which is ordinarily regarded by those conversant with the employment as necessary to qualify him to engage in the business of practicing medicine and surgery. Upon consenting to treat a patient, it becomes his duty to use reasonable care and diligence in the exercise of his skill and the application of his learning to accomplish the purpose for which he was employed.

He is under the further obligation to use his best judgment in exercising his skill and applying his knowledge. The law holds him liable for an injury to his patient resulting from want of the requisite knowledge and skill, or the omission to exercise reasonable care, or the failure to use his best judgment. The rule in relation to learning and skill does not require the surgeon to possess that extraordinary learning and skill which belong only to a few men of rare endowments, but such as is possessed by the average member of the medical profession in good standing. Still, he is bound to keep abreast of the times, and a departure from approved methods in general use, if it injures the patient, will render him liable, however good his intentions may have been. The rule of reasonable care and diligence does not require the exercise of the highest possible degree of care, and to render a physician and surgeon liable, it is not enough that there has been a less degree of care than some other medical man might have shown, or less than even he himself might have bestowed, but there must be a want of ordinary and reasonable care, leading to a bad result. This includes not only the diagnosis and treatment, but also the giving of proper instructions to his patient in relation to conduct, exercise and the use of an injured limb. The rule requiring him to use his best judgment does not hold him liable for a mere error of judgment, provided he does what he thinks is best after careful examination. His implied engagement with his patient does not guarantee a good result, but he promises by implication to use the skill and learning of the average physician, to exercise reasonable care and to exert his best judgment in the effort to bring about a good result."

We will first consider the case in so far as it pertains to Dr. Kenyon:

In answer to a hypothetical question, which was duly objected to on the ground that there were no facts contained in it indicating the " man's condition " while he was in the hospital, Dr. Taferner said: " My opinion is that improper treatment in the latter two weeks of his — between the time of the 4th and the 26th, was used." It does not appear that he considered the then existing condition of respondent's leg and his physical condition at the time he expressed this opinion. He seems to have based his conclusion solely upon an examination of the X-ray plates. He said that he would have removed the cast on November thirteenth, and by manipulation tried to get a better apposition of the fragments. He freely admitted that a manual reduction at that time might have made the situation worse, and even though successful there was no way of telling that the bones would have remained in apposition. In any event he stated that the matter was one of judgment on

which some might agree that he was right and others would disagree. " The rule [said Judge VANN, *supra*] requiring him to use his best judgment does not hold him liable for a mere error of judgment, provided he does what he thinks is best after careful examination."

Upon being asked if he felt he would have been justified in making any attempts at remanipulating the bones after the X-ray of November ninth was taken, Dr. Kenyon said: " There wouldn't be much prospect of getting any improvement, even if an anesthetic were given; you might temporarily correct that sliding upward and outward, but the hard part would be to hold it after you obtained a correction. That is, no circular cast could be applied to hold it. It has to be applied quite tightly to hold it and the soft part would prevent your doing that. Then the manipulation necessary to reduce that — tissue engorged with blood and a case where the skin was originally infected — he had a boil there, that had to be opened; there was great danger of squeezing that infection into the surrounding tissue and making an abscess perhaps in the deep parts, possibly in the bone; possibly it gets in the blood stream, and you get some trouble in other parts of your body." Dr. Kenyon further testified: " By moving it, you not only disturb the process of repair which starts as soon as the fracture occurs really; you tear that all apart; you would round off or smooth off the surfaces which always have little indentations on them which fit in and dovetail into the irregular surfaces on the other portion and tend to hold it. By manipulating, those would be smoothed off. Also the blood in the little vessels that would be torn, would be squeezed out; new hemorrhage would occur; also some of these little pieces of matter might be squeezed into the vessel instead of outside; then they would float in the blood stream; that is what is called an ' embolus; ' and that floats around until it meets some vessel it can't go through, and according to where that place is, it is a very serious outcome." Dr. Kenyon was then shown the X-ray taken on November twenty-sixth. Comparing that with the one taken on the thirteenth he was asked the following questions, and gave the following answers: " Q. Now did you find that there had been any change between the 13th and 26th? A. Perhaps just a slight bit more external displacement. Very little, though. Q. Now I think this picture, doctor, we better have on the shadow box. I want you to take 4 and 4-A, doctor. Now, doctor, I want you to tell the jury just what that plate shows (indicating Exhibit 4 on shadow box). A. It shows this oblique or spiral fracture at this point, the lower third of the tibia, with displacement of this,

the lower piece with the foot attached to it, outward. They are still engaged there for quite some distance of the fracture surface. There is the line on which this part has slid outward along that oblique line, and has turned outward; it had to come up this way. Q. Then, doctor, in your opinion was there sufficient contact between the two ends of the bone so that, when you get a callus formation, if instructions had been followed, you would get a functional result even though there might have been some slight deformity? A. Yes, I do. * * * Q. Did you believe, doctor, exercising your best judgment as a doctor at that time, that the bones were in sufficient apposition to give a functional result? A. I do."

We do not believe that Dr. Kenyon was guilty of even an error of judgment, considering the condition of the patient in the failure to reset the leg on the twenty-sixth of November. Surely it cannot be said that he failed to exercise reasonable care and diligence. For aught we know, even assuming that nothing happened between the time respondent left the hospital and the date he first consulted Dr. Taferner, an operation of the type he finally submitted to at the latter's hands might have been necessary in any event. It must be borne in mind that Dr. Kenyon was in no way responsible for the fall which respondent suffered. He can only be held to answer for actual malpractice. No competent evidence was offered by respondent to show that Dr. Kenyon did not use the skill and learning of the average physician or that he failed to follow the proper and approved practice in his treatment. On the other hand, Dr. Henry Roth, a fellow of the American College of Surgeons, and for thirty-six years attending surgeon at Lebanon Hospital in the Bronx, expressed the opinion that the methods pursued by Dr. Kenyon were entirely proper.

In so far as Dr. Nicoll was concerned, it is rather difficult to understand the theory upon which the case against him was submitted to the jury. The testimony on the trial indicates quite clearly that he did not treat the respondent. As head of his surgical division he made the rounds of the ward; he did not ordinarily examine the patients. He did not read the plates which were taken of respondent's injured leg, nor did he owe any particular duty to him since it appears that the respondent was under the care of Drs. Kenyon and Carravetta. Furthermore, it appears that Dr. Kenyon did not even discuss the case with him.

We have reached the conclusion, therefore, that no cause of action was made out, and the court erred in submitting this case to the jury. The judgment in so far as it provides for a recovery by

the plaintiff against the defendants, appellants, and the order appealed from, should be reversed, with costs and the complaint dismissed as to both appellants, with costs.

MARTIN, P. J., MERRELL, TOWNLEY and UNTERMYER, JJ., concur.

Judgment in so far as it provides for a recovery by the plaintiff against the defendants, appellants, and the order appealed from, reversed, with costs to the appellants, and the complaint dismissed as to both appellants, with costs.