# SMITH v. BEARD ET AL.

(No. 2159; February 18, 1941; 110 Pac. (2d) 260)

For the plaintiff in error there were briefs by *E. E. Enterline* and *William B. Cobb* of Casper and *T. C. Daniels* of Douglas, and oral arguments by *Messrs. Enterline* and *Cobb*.

For the defendant in error, Beard, there was a brief by *C. Henry Austin,* and *Hagens & Wehrli* of Casper.

In behalf of defendant in error, R. H. Reeve, there was a separate brief by *R. R. Rose* of Casper.

BLUME, Justice.

This is an appeal by the plaintiff, Janet R. Smith, from a judgment entered for the defendants, pursuant to a directed verdict, in a malpractice case wherein the plaintiff seeks to recover judgment against the defendants for the sum of $150,000.

■ Undisputed Facts.

The plaintiff was severely injured in an explosion in a chemical room of the Standard Oil Company at Casper, Wyoming, on January 15, 1934. She received some first degree, second degree and third degree burns, which are severer in the reverse order named. The first degree burn is one which produces an inflamma-

tion of the outer layer of the skin, like a sunburn. A second degree burn is one which passes down through the two layers of skin, but not into the structure below. The third degree burn is a burning of the full thickness of the skin and the structure immediately below, and on down. Plaintiff received some first degree burns on the face and the neck. These healed within approximately two weeks. The right leg had burns up to the thigh; they were chiefly of second degree. The severest injuries were on the left arm and the left leg. The burn on the left arm was very deep in the muscles above the elbow and almost up to the axilla, those close to the axilla not going so deep. The burns around the left elbow and above the elbow were of second and third degree, immediately above the elbow, of third degree, the chief burns being on the inside of the arm. The back of the left hand had burns of second degree. The left leg was burned severely, and was ultimately left in the worst condition of any part of plaintiff's body. The burned area extended practically to the hip. The area below the knee was all denuded, so that the tendons could be seen, and they had a brownish appearance. The burns encircled the leg, and were to a considerable extent of third degree.

The process of healing a large area which has been burned takes considerable time, especially if there is infection, and sometimes nature fails to accomplish it. In such cases skin-grafting is employed. It appears that that is usually or at least frequently necessary in case of burns which encircle the limb (called circular burns). Skin-grafting, when necessary, should be done as soon as the conditions of the wounds permit. To do so the wounds must be free from infection and from dead tissue, and there must be healthy granulation.

Dr. Johnson testified that from 20 to 25 per cent of plaintiff's body was burned. Dr. Drinkwater testified that between 26 to 28 per cent of the body was burned;

that a burn embracing 10 per cent of the body is serious. First and second degree burns covering a third of the bodily area is considered fatal; that the plaintiff, accordingly, was in great danger of her life.

The plaintiff, after the explosion, was first taken to a first-aid station of the oil company, and on the same day was removed to Memorial Hospital at Casper, where she was placed in a private room, and had a day nurse and a night nurse until about March 6, 1934, and after that, until she went to Chicago, had a day nurse. This was aside from intermittent help of other nurses, and the substantially daily attendance of Dr. Reeve. The plaintiff was put into bed, and a sort of tent formed over her. Her legs were sprayed with tannic acid for a period of about three weeks, which formed a coating. This coating was gradually removed over a period of another three weeks, and the legs were then sprayed with mercurochrome, vaseline, petrolatum, etc., and bandaged. The bandages were removed and renewed every day. The left arm and the right leg were sprayed with mercurochrome, vaseline, etc., bandaged and the bandages renewed every day. In changing the bandages, she was moved over to her right side, which was done with great difficulty. A rod with a hook on it was finally placed across the bed, so that she could seize it with her right hand and thus help in turning her over to her right side. It would take an hour to change the dressings and put her back into her original position. The moving would be very painful. It was not possible to turn her over to rest on the left side, since that was badly burned. It may be stated in general, that no complaint is made of the care taken by the nurses or of the treatment, care and attention of the defendant Reeve, except only in the particulars hereinafter mentioned.

On June 26, 1934, plaintiff was taken to Chicago to be skin-grafted. She was accompanied by the defend-

ant Reeve, her mother, and Miss Bezold, her day nurse. She arrived in Chicago in the evening of June 27th, and was lifted out of the window of the Pullman car, was taken to a hospital and put under the care of Dr. Bryce Reeve, a brother of the defendant Reeve, and Miss Cherne, a nurse. Dr. Bryce Reeve called a Dr. Schaeffer for consultation. The next day, the defendant Reeve went home to Casper, leaving the plaintiff in the care of his brother, who, on July 2, skin-grafted the plaintiff, taking the grafts from the plaintiff's abdomen. Only the left leg was grafted. About 200 grafts were used, all of which "took" perfectly. Plaintiff remained in Chicago under the care of Dr. Bryce Reeve until about September 1st, 1934. At that time she left, going by way of Denver to consult Dr. Packard about her foot. She was accompanied by Miss Cherne, a nurse. She then returned to Casper, accompanied by the same nurse, and again went under the care of Dr. Reeve, the defendant herein. Miss Cherne attended plaintiff, who was taken to the home of her mother, for the period of two weeks. Mrs. Frisch, a nurse, then attended her until the spring of 1935. At that time, Miss Eschwig took her place, and attended plaintiff until January, 1936, when Mrs. Grierson took her place, and attended plaintiff until April 5, 1936. After that for a number of weeks, plaintiff went to the first aid station already mentioned, where she was given some attention by Mrs. Carter, a nurse. When plaintiff got back from Chicago, her left foot had dropped, which was not true when she went to Chicago. The right foot, too, was crooked. Under instructions of Dr. Reeve, her arms and legs were massaged and manipulated all the time, although little was done with the left foot on account of its tenderness. The right leg was finally straightened. According to the recommendation of Dr. Packard a cast was put on plaintiff's left foot on November 30, 1934, her knee, which had be-

come crooked, was straightened. The cast was kept on for about three weeks, but no second cast was put on, for the reason, among others, as testified by the defendant Reeve, that to do so would have broken the skin. Furthermore, at the request of Dr. Reeve, one Anton Loncsek, a masseur, massaged plaintiff's arm and shoulder, and applied electrical treatments from January to May, 1935, giving a treatment every other day for a month or two, and then every third day.

It appears that all expenses incurred on behalf of the plaintiff up to May, 1936, were paid by the Standard Oil Company, including the expenses for hospitals, the nurses at Casper and Chicago, consultation fees, if any, of the doctors called in for consultation, and including $1.50 per day paid to plaintiff's mother from the time that plaintiff returned from Chicago to May, 1936. At that time the company discontinued the payment of that money, but gave plaintiff the privilege to avail herself of the facilities of its hospital for further care and treatment. Plaintiff availed herself of that privilege for about six weeks, but not thereafter, and the defendant Reeve's employment then terminated.

At the time of the trial of this case, the plaintiff was able to draw her left arm away from the body "to a right angle," but no further. She had a marked weakness of the left hand. Her left foot still dropped. She could not get her heel down. The motion of the left foot was very much limited. It was necessary to hold the leg to move the foot, and the skin-grafts on her leg were still so thin that the examining physician was afraid to use any pressure. She was unable to walk without crutches, and will probably be a cripple all her life.

The defendant Reeve is a physician and surgeon, employed by the Standard Oil Company, and other companies, and is in private practice. His services are

available to the large number of employees of the Standard Oil Company without charge. He graduated from Rush Medical College in Chicago in 1920; took a regular course in medicine at the University of Chicago and two clinical years at Rush Medical College; served an interneship at Passavant Hospital a little over a year; practiced at Whiting, Indiana, from 1920 to 1924, doing industrial surgery, including treatments for burns. He came to Wyoming in 1924, was duly admitted to practice here, and has resided in Casper since that time. Dr. Bryce Reeve, to the knowledge of plaintiff, was, in June, 1934, a physician and surgeon in Chicago, the acting Medical Director of the Standard Oil Company, and thereafter, upon the death of Dr. Morton, became the Medical Director. He was also the physician and surgeon for the Whiting Refinery.

Dr. L. D. Johnson of Casper, the only physician who testified on behalf of the plaintiff, graduated from the College of Physicians and Surgeons at Chicago in 1897, taught surgery about 18 years at Loyola University, Chicago Medical College and the College of Medicine and Surgery, and has practiced medicine and surgery in Chicago and Casper since his graduation. He testified that he had large experience in treating burns. He first examined the plaintiff in September, 1936. The physicians and surgeons who testified in favor of the defendant all appear to be competent men in their profession, with experience in the treatment of burns.

■ The Case Against Defendant Beard.

R. E. Beard was made a defendant herein. He was the superintendent of the Standard Oil Company at Casper. It appears that plaintiff's sister had a talk with him as to the plaintiff's trip to Chicago, and that Mr. Beard stated that it would be the best to go there, since there were good specialists in Chicago, and that "they" would get a good specialist to do the skin graft-

ing; that he did not, at the time, state that Dr. Bryce Reeve would do the operating. The witness testified that she had a further talk with Mr. Beard in October, 1934, as to helping out in connection with the expenses for taking care of the plaintiff, and that he stated that he would do something about it. The payment of $1.50 per day by the Company, already mentioned, was the result of the conversation. The witness further stated that Mr. Beard at that time stated that he had not seen plaintiff, but that he had heard about her condition every day and was keeping in touch with it and the care she was given. It further appears that Mr. Beard, on behalf of the Company, arranged for the expenses of plaintiff's trip to Chicago. At the close of plaintiff's evidence, the court, upon motion, directed a verdict on behalf of the defendant Beard. Counsel for the plaintiff argue that "the evidence shows that he at all times kept in touch with her treatment. If that be true he knew of the various delays on the part of the defendant Reeve and his negligence. Indeed the evidence shows that he must have known of the incompetence of the defendant Reeve to properly treat and care for her injuries, because he arranged for her transportation to Chicago." In other words, the mere fact that the plaintiff was taken to Chicago, instead of being skin-grafted in Casper by the defendant Reeve, shows, according to this argument, that Dr. Reeve was incompetent, and that Mr. Beard knew it. We think the claim is not reasonable, and it has been so held. Scherer v. Eidenmuller, 45 Cal. App. 372, 187 Pac. 445. If it were valid, we fear that every physician who recommends that his patient should go to Mayo's, to Chicago, to Denver, or any other place, would thereby show that he is incompetent, and knowledge of that fact would thereby be conveyed to every one who participated in sending the patient away. A great number of the physicians in this state would, we fear, if the

argument were true, stand convicted of incompetence, since scores are sent away from time to time' to have the care of some other physician in larger cities. Mr. Beard did not employ the defendant Reeve. He was employed by the Standard Oil Company, and under that employment his services were available to all the employees of the company without charge. The defendant Reeve treated the plaintiff as a matter of course, in pursuance of that employment, and the plaintiff, as a matter of course, expected that treatment. Since the defendant Beard, as an individual, had nothing to do with the employment of Dr. Reeve, he cannot be held responsible for what the doctor did or did not do. The mere fact that he kept in touch with the plaintiff's condition would not alter that, nor would it show that he knew that Dr. Reeve was either incompetent or negligent, for he is not a physician, and naturally did not know. Nor are any facts shown herein that he should have known. We think that the court was clearly right in directing a verdict as above mentioned. See in this connection Stanolind Oil & Gas Co. v. Bunce, 51 Wyo. 1, 18-19, 62 P. (2d) 1297; Williams v. Union Pacific R. R. Co., 20 Wyo. 392, 403, 124 Pac. 505; Engirbritson v. Cedar Co., 91 Wash. 1279, 157 Pac. 677; Atlantic Coast Line R. Co. v. Whitney, 62 Fla. 124, 56 So. 937; Hardin v. Southern R. Co., 128 S. C. 216, 122 S. E. 582.

■ Rule of Law in Directing Verdict.

At the close of all the evidence, the defendant Reeve moved the court for a directed verdict, which was granted, and error is assigned on that account. It will be necessary, therefore, to review the evidence, and, unfortunately, on account of the number of charges of negligence, and on account of the voluminous record, consisting of about 800 pages, the opinion herein will necessarily be long, despite all we can do in making it

shorter. However, it is impossible to discuss the case intelligently till we examine some of the rules of law applicable in directing a verdict, especially in view of the fact that counsel for the respective parties cite and appeal to rules which do not appear to be in harmony. Counsel for the respective parties insist upon the application of the rule cited by them without an attempt to examine, discuss or distinguish the rule relied upon by the opposing counsel, leaving us the task to do so. We could have wished that we had before us the views of the respective counsel as to why the rule or rules cited by the opposing counsel should not be applied herein. And we regret the absence thereof the more in view of the fact that we know that counsel for both sides of the case are among the ablest attorneys in the state, and who could have aided us much in the solution of the problem before us, had they taken the trouble to do so. We shall do the best we can under the circumstances.

Counsel for plaintiff insist upon the rule that the court, in determining whether a verdict should be directed in favor of a defendant in a malpractice case, can only consider the evidence in favor of the plaintiff, including the evidence introduced by the defendant favorable to the plaintiff, and the inferences fairly drawn from them, and that the court cannot consider the evidence favorable to the defendant. The question here is whether or not the last part of this contention is correct, namely, that the court cannot in such case take into consideration the evidence favorable to the defendant. Counsel for the defendant Reeve contends the contrary, citing cases. He vigorously argues that the plaintiff has failed to make out a case even under the contention made by her counsel. Still he refers numerous times to the testimony favorable to the defendant, and we shall assume, without deciding, that if the contention here made by counsel for plaintiff

were correct, the case should have been submitted to the jury. In this view the respective contentions made herein become of vital importance. A number of our own cases are cited which sustain the contention of counsel for plaintiff and which ordinarily is doubtless correct. That is the rule stated in 4 C. J. 857, which we cited in Willis v. Willis, 48 Wyo. 403, 429, 49 P. (2d) 670. The rule was applied in Sim v. Weeks, 7 Cal. App. (2d) 28, 45 P. (2d) 350; White v. Burton, 180 Okl. 499, 71 P. (2d) 694; Phillips v. Stilwell, (Ariz.) 99 P. (2d) 104; McLellan v. Holder, 1 Cal. App. (2d) 305, 36 P. (2d) 448, 452; Stohlman v. Davis, 117 Nebr. 178, 220 N. W. 247, 60 A. L. R. 658—all malpractice cases. Many others might be cited. We considered the rule to some extent in Harris v. Schoonmaker, on rehearing, 50 Wyo. 119, 150, 58 P. (2d) 415, 60 P. (2d) 360, where we stated that "it is assuredly the duty of the court to survey the entire evidence in the case, where, as here, a motion to direct a verdict was made after the evidence of the parties had all been introduced. If this is not done, an unjust and inaccurate result might easily be reached." Counsel for plaintiff contend that the expert testimony of Dr. Johnson, who testified for plaintiff, taken in connection with the other testimony for plaintiff, made it imperative for the court to submit the case to the jury. In fact they contend that some extra-judicial statements made by Dr. Bryce Reeve in presence of the defendant (which will be mentioned hereafter) were sufficient to carry the case to the jury.

Commenting on the possible results of applying the rule contended for here by counsel for plaintiff in all cases, the supreme court of Minnesota in Staloch v. Holm, 100 Minn. 276, 111 N. W. 264, 9 L. R. A. N. S. 712, stated that "if every verdict mulcting a reputable physician in damages must be sustained if any of his professional brethren can be induced to swear that

assuming the testimony of the family and friends of the patient to be true, the physician had made a mistake of judgment or had been guilty of unscientific practice, then the profession would be one which "unmerciful disaster follows fast and follows faster.'" And the supreme court of Oregon was led to remark in Langford v. Jones, 18 Or. 307, 324, that "persons who devote their lives to the study of physiology and anatomy, with a view to relieve the misfortunes and sufferings of mankind, deserve encouragement. The practice of bringing that character of actions (malpractice) against surgeons of acknowledged skill and ability, and subjecting them to the payment of large sums of money, has had a strong tendency to induce them to hesitate about setting broken bones or performing other operations essential to the alleviation of human misery, and if not checked, is liable to drive them out of the profession and leave the performance of its duties to irresponsible quacks and empirics." To the same effect is Johnson v. Clarke, 98 Cal. App. 358, 276 Pac. 1052. "True to life," said the supreme court of Colorado in Brown v. Hughes, 94 Colo. 295, 30 P. (2d) 350, "as we see it and live it, we venture the suggestion that it becomes easy for the professional man to say a certain course was improper when the results thereof prove to be bad."

The simple fact is that courts in numerous malpractice cases have considered the testimony on behalf of the defendant in determining whether or not a verdict was properly directed, or a result similar thereto should be reached, and in some cases have considered such testimony to be controlling. In Gramaldi v. Zeglio, 3 N. J. Misc. 669, 129 Atl. 475, the testimony of the physicians testifying in favor of the plaintiff and those testifying for the defendant differed as to what should have been done in treating plaintiff's arm when an infection appeared. The court, in holding that a di-

rected verdict was proper, stated: "The evidence offered in behalf of the plaintiff was opinion evidence to the effect that a different course of treatment should have been followed. The defendant's witnesses approved the course taken. * * * It takes more than the opinion of one or more physicians or surgeons that the treatment followed in a given case should have been different to lay the foundation for malpractice." In McGuire v. Rix, 118 Nebr. 434, 225 N. W. 120, 123, the plaintiff contended that the method adopted by the defendant in draining an injured ankle and wound was wrong and negligent, and the contention was sustained by a physician. The court stated that "one of the experts called by plaintiff * * * condemned this system of drainage and approved another. Conceding that he testified to a proper method not followed by defendants, the difference in expert opinion did not raise a question of fact for the jury, for the reason that one of two recognized methods may be used without negligence." In Duckworth v. Bennett, 320 Pa. 47, 181 Atl. 558, the defendant treated plaintiff's knee for arthritis. It was contended that the treatment was wrong and negligent, and that the trouble with the knee was due to a fall. A physician testified for the plaintiff, other physicians testified in favor of the defendant. The court in upholding a directed verdict stated that "where competent medical authority is divided, a physician will not be held responsible if, in the exercise of his judgment, he followed a course of treatment advocated by a considerable number of his professional brethren in good standing in the community." In Dahl v. Wagner, 87 Wash. 492, 151 Pac. 1079, there was a difference of opinion among the physicians testifying for the plaintiff and defendant as to whether the defendant was sufficiently prompt in setting a dislocated bone while there was an infection. The court in holding a directed verdict proper on this point stated that "it has been

the uniform holding of this court that where doctors of equal skill and learning, being in no way impeached or discredited, disagree in opinion upon a given state of facts, the courts cannot hold a defendant in a malpractice suit to the theory of the one to the exclusion of the other. * * * It is enough if the treatment employed 'have the approval of at least a respectable minority of the medical profession who recognized it as a proper method of treatment.' " In Callahan v. Hospital (Cal. App.) 26 P. (2d) 506 (affirmed on another ground, 1 Cal. (2d) 447, 35 P. (2d) 536), the charge of negligence was the injection of glucose, one physician testifying that the injection of a solution of ten per cent was negligent. Physicians testifying for the defendant considered the treatment proper. A verdict for the plaintiff was set aside, with direction to enter judgment for the defendant, the court approving the rule of Dahl v. Wagner, supra, to the effect that it is enough if the treatment has the approval of a respectable minority, stating that in such case it must be held that the treatment so recognized and approved is a recognized and approved method. In Gleason v. McKeehan, 100 Colo. 194, 66 P. (2d) 808, the question was as to whether a Caesarean operation performed by the defendant was proper, five physicians testifying for plaintiff condemning the procedure followed, and ten physicians approving it. The court approved its holding in Brown v. Hughes, supra, that physicians "must first have left and entirely abandoned all knowledge acquired in the fields of exploration and adopted some rash or experimental methods before they approached the danger zone of liability," and stated further:

"There is no conflict as to the facts, only a difference in views as to the proper method to have been followed. Where there is such a divergence of opinion between physicians schooled in such matters, as we find here, how can it reasonably be expected that 12 laymen as

jurors could determine the technical questions involved with fairness to the parties concerned? This record presents a clear case in which the medical witnesses disagree, and in such circumstances the competent physician in charge is bound only to exercise his best skill and judgment in determining the course to be followed and acting accordingly. In so doing, he incurs no liability. * * * The motion for non-suit should have been granted."

In Linn v. Peirsol, 37 Cal. App. 171, 173 Pac. 763, the defendant was sought to be held liable for using silk in an operation instead of catgut, and a physician testified in favor of the plaintiff that a careful surgeon would not have used silk. The court took into consideration the testimony of the defendant, and held that under the circumstances a verdict should have been directed for him.

Without referring to other cases in detail, suffice it to say that the rule of the foregoing cases was approved and applied and judgment was given in the following malpractice cases in favor of defendant by direction of the court, though the evidence was conflicting: Perricord v. Lieser (Wash.) 105 P. (2d) 5; Remley v. Plummer, 79 Pa. Super. Ct. 117; Bigney v. Fischer, 26 R. I. 402, 59 Atl. 72; Kinsley v. Caravatta, 244 App. Div. 213; Moore v. Travelling, 78 Fed. 821 (at least partially) ; Wilson v. Borden, 61 App. D. C. 327, 62 F. (2d) 866; Brown v. Hughes, supra. The rule announced in the foregoing cases was also approved, at least in substance, in Hazen v. Mullen, 32 Fed. 396; Snyder v. Ry. Co., 228 Mo. App. 626, 72 S. W. (2d) 504, 512; Barnard v. Schell, 85 Pa. Super. Ct. 329; Dunn v. Beck, 80 Mont. 414, 260 Pac. 1047; Jensen v. Findley, 17 Cal. App. (2d) 536, 62 P. (2d) 430; Donahoo v. Lovas, 105 Cal. App. 705, 288 Pac. 698; Hall v. Partlow, 168 Wash. 289, 11 P. (2d) 819; Staloch v. Holm, supra; Coon v. Shields, 88 Utah 76, 39 P. (2d) 348; Schumacher v. Hospital, 58 Mont. 447, 193 Pac. 397, 403.

The rule seems first to have been announced in Leighton v. Sargent, 27 N. H. 460, 474, where the court stated that "to charge a physician or surgeon with damages, on the ground of unskillful or negligent treatment of his patient's case, it is never enough to show that he has not treated his patient in that mode, nor used those measures, which, in the opinion of others, even medical men, the case required; because such evidence tends to prove error of judgment for which the defendant is not responsible, as much as the want of reasonable care and skill, for which he may be responsible."

If there is no definite and prescribed mode of treatment, and the case is one of doubt, the attending physician must necessarily use his own best judgment, and, it has been held, is not liable in damages even though his treatment turns out to be wrong, at least if there is a difference of opinion of experts on the subject. Carpenter v. Blake, 60 Barb. 488, 523; Vanhooser v. Berghoff, 90 Mo. 487, 496; James v. Grigsby, 114 Kans. 627, 220 Pac. 267, 269. It may be noted that the case at bar presents a severe case of burns. The testimony fails to show that there is a definite and prescribed, and generally accepted, mode of treatment of such a case, except in some particulars. And, unfortunately, we have found no case on record in which a court has considered the treatment of a patient at all similar to that in the case at bar.

The cases above cited do not directly discuss the point of contention herein, namely, whether the court has the right, in directing a verdict, to take the defendant's testimony into consideration. But the courts actually did so, and it is clear that the cases are entirely inconsistent with the contention of the plaintiff herein in the class of treatments embraced and contemplated therein. In Swanson v. Hood, 99 Wash. 506, 170 Pac. 135, the court in referring to the rule above

mentioned stated that in case of such difference of opinion as to the choice of method, the charge of negligence "is refuted as a matter of law by showing that a respectable minority of expert physicians approved of the method selected, thus taking the case from the jury." The meaning of that statement is clear. And if the rule is sound, that in certain cases a physician and surgeon should not be held liable in damages if his course is approved by a respectable minority of the profession, it would seem that it should make no difference whether that approval appears in the case in chief made by the plaintiff, or by evidence introduced by the defendant. In fact it is difficult to see how the rule could be effectually applied otherwise.

Many of the courts have not considered the rule, at least not directly, and we do not know whether or not, if the point came up, they would apply it as a matter of law, as was done in many of the cases already cited. Some of the cases which we have read seem to hold that in all cases of difference of opinion, the case is one for the jury to decide. See, e.g., Stahlman v. Davis, supra; Tomer v. Aiken, 126 Iowa 114, 121. If possible, some reasonable criteria should be found under which the jury can pass upon actual conflict of facts and circumstances on which they are qualified to pass, while at the same time guarding against the danger that they may base their verdicts upon mere sympathy and conjecture. It would be of service to the courts if some one, e.g., one of the able editors of American Law Reports, would undertake to investigate the subject so thoroughly that no doubt could remain as to the status of the law in the various jurisdictions. There have been many dissenting opinions in malpractice cases, and it may be that the last word has not yet been spoken on the subject, and perhaps never will be. A good illustration is found in the late case of Hodgson v. Bigelow, 335 Pa. 497, 7 A. (2d) 338. The whole

court re-affirmed the rule mentioned in the Pennsylvania cases already cited. The majority of the court, however, thought that the case presented a factual situation, in that the experts disagreed as to the character of the wound which was treated in that case— whether it was a puncture wound or not—and that hence the case should be left to the jury to decide. A minority of three held that the character of the wound could not be decided by laymen, and that, if the experts disagree, the rule of Remley v. Plummer, 79 Pa. Super Ct. 17, should be applied, and a verdict directed for the defendant. The case of White v. Burton, (Okla.) 71 P. (2d) 694, relied upon by counsel for plaintiff, appears to be similar to the Hodgson case, and the court's ruling like that of the majority in that case.

The adoption of a method or course of treatment necessarily involves the exercise of judgment. Hence the rule of the cases above mentioned is but a part of the more general and broader rule which treats of the subject of error of judgment mentioned in 48 C. J. 1127. Several instances of the exercise of judgment arise in the case at bar, and we shall, for a moment, consider the authorities which deal directly with that point, and the reason of the rule of the cases already cited will then become clearer. In an ordinary action for negligence, the fact that a man has acted according to his own best judgment is no defense. The standard of careful conduct is not the opinion of the individual, but is the conduct of the ordinarily prudent man under the circumstances. Staloch v. Holm, supra. And it has been broadly stated that in conduct like that of a surgeon, resting upon judgment, opinion or theory, the ordinary rules of determining negligence do not prevail. Delahunt v. Finton, 244 Mich. 22; Staloch v. Holm, supra. That includes the fact that the standard of conduct of physicians is judged by the standard of conduct of a smaller group than men generally, namely,

by that of the men of their profession. "Physicians," it has been said, "and surgeons must be allowed a wide range in the exercise of their judgment and discretion. The science of medicine is not an exact science. In many instances there can be no fixed rule by which to determine the duty of a physician, but he must often use his judgment and act accordingly. By reason of that fact the law will not hold a physician guilty of negligence as long as he uses his best judgment, even though his judgment prove erroneous in a given case, unless it is shown that the course pursued was clearly against the course recognized as correct by the profession generally. As long as there is room for an honest difference of opinion among competent physicians, a physician who uses his own judgment cannot be convicted of negligence, even though it may afterwards develop that he was mistaken." Bailey v. Railroad Co., (Mo. App.) 296 S. W. 477; Snyder v. Ry. Co. (Mo. App.) 72 S. W. 504, 512. If this statement is correct, then, it would seem, the mere fact that testimony for the plaintiff appears to the effect that a certain course pursued by the defendant was not in accordance with the practice generally in the particular community should not make the case one for the jury, if the contrary clearly appears by the testimony of reputable and unimpeached physicians or surgeons in the same general community. Dahl v. Wagner, supra. Every physician who disapproves a certain course would in most instances doubtless, though, of course, not necessarily, add or state that it is not in accordance with the proper practice in his community, so that such statement or addition would be a criterion too weak and doubtful for determining whether or not a case should be left to the jury.

Many cases have announced the broad rule that physicians and surgeons are not liable for an honest error of judgment, but that statement does not appear to be

generally accepted, and it is stated that, if he is competent, he is not liable "where there is a reasonable doubt as to the nature of the physical condition involved or as to the proper course to be followed, or where good judgments differ." 48 C. J. 1127; 21 R. C. L. 391. See also Herzog, Medical Jurisprudence, Sec. 181. But what is an error of judgment? It has been held that, generally, if a duly qualified expert— e.g., a physician and surgeon—possessing the requisite knowledge and skill—makes careful investigation, and then determines upon the course to take, and if he faithfully carries out that course, then, if it turns out to be wrong, he is but guilty of an error of judgment for which he is not liable. The Tom Lysle, 48 Fed. 690, 693; Daily v. Shaffer, 178 Mich. 577, 146 N. W. 193; Wilson v. Pilot's Assistant, 57 Fed. 232; Casenburg v. Lewis, 163 Tenn. 163, 40 S. W. (2d) 1038; Meador v. Arnold, 264 Ky. 378, 94 S. W. (2d) 626. The statement has been found to be inadequate, and the Minnesota court in Staloch v. Holm, supra, elaborated upon it, and held that in so far as medicine is a science, an error of judgment will not entail liability, but that in so far as it is an art, a wrongful treatment makes him accountable for damages; e.g., the determination whether an operation should be performed or not is an exercise of judgment, and comes within the sphere of science, but when an operation is actually performed, that comes within the field of art; for example, if a physician uses a defective instrument, operates on the wrong arm, sews up a sponge in the human body, his wrong concerns a physical fact, and is governed by ordinary principles of negligence. We might add other examples, as shown by decided cases: Burning by X-ray, scalding patient in a hot bath, slipping of a drill, knife or other apparatus, using an unsterilized instrument, failure to remove placenta. So, too, desertion of a patient, insufficient examination, failure to

discover trouble easily discernable, insufficient attendance, have been held sufficient to carry a case to the jury. In Sim v. Weeks, 7 Cal. App. (2d) 28, 45 P. (2d) 350, 354, the court attempted to draw the proper distinction, and see Burdett v. Layman, 133 Tenn. 323, 181 S. W. 157.

In but comparatively few of the cases in which the court has stated the general rule as to error of judgment was a judgment for one reason or another, directed, as a matter of law, for the defendant. In Meador v. Arnold, 264 Ky. 378, 94 S. W. (2d) 626; Stacy v. Williams, 253 Ky. 353, 69 S. W. (2d) 697, 705; Nicholas v. Jacobson, 113 Cal. App. 382, 298 Pac. 505, we find the statement that "where the proof of facts which show or tend to show negligence on the part of a physician or surgeon depends upon expert opinion, if it shows nothing more than an error of judgment, there is in law no proven facts upon which the inference of negligence may be founded." Here an error of judgment is not considered to be a "fact" which the plaintiff must prove, just as in Gleason v. McKeehan, supra, an "opinion" in which physicians differed was not considered of the dignity of a "fact." But the statement otherwise is not clear. A physician and surgeon must exercise that judgment which a competent physician in his community would exercise. Kline v. Nicholson, 151 Iowa 710, 713, 130 N. W. 722; 48 C. J. 1121; Herzog, supra. Hence, though it should appear that an act complained of consisted of an error of judgment, yet we doubt that if a competent physician and surgeon should testify in a malpractice suit that the defendant did not exercise his judgment in accordance with that standard, and no testimony to the contrary appears, a court would feel justified in taking the case from the jury. It would, however, seem, from an examination of a large number of cases, that the minimum that can be said on the subject is that the courts judge acts or

omissions involving and constituting an exercise of judgment somewhat differently, and somewhat more leniently, than other acts and omissions. That already appears from some of the citations above made, and appears for instance in McBride v. Roy, 177 Okl. 233, 58 P. (2d) 886, where the court stated:

"For the reason that the course he should pursue in many cases, and in the light of foresight, is purely a matter of opinion in which some of the professional brethren would agree and some disagree, he is not held responsible for an error of judgment unless that error is so great as to constitute negligence. Negligence may consist of an error of judgment, or cause it to grow from it, but an error in judgment is not necessarily negligence."

So in Gottschall v. Geiger, 207 Mo. App. 89, 231 S. W. 87, and Fausette v. Grimm, 193 Mo. App. 585, 186 S. W. 1177, it was said that a surgeon could be condemned for operating, when an operation was shown not to have been necessary, only when it appeared that it was "palpably" unnecessary.

Whether an act or omission involves and constitutes an exercise of judgment is ordinarily, if not always, plain, and hence would be a question of law for the court. But if the question as to whether an error in judgment, if it is an error, is great or gross, must always be left to the jury, it is doubtful, in view of the few instances among the many decided cases in which juries have brought in a verdict for the defendant, that the profession would receive the protection of the law to which it is entitled. There must be some reasonable scope left to the trial judge to give effect to a rule to which all the courts, so far as we know, give at least lip-service. According to Callahan v. Hospital, supra, a course of treatment approved by a respectable minority must be considered as a course of treatment approved generally.

Hence, though it may be hard to state a rule applicable in all cases, we suggest, in attempting to state a conclusion which is aimed at being conservative, that if an act or omission of a competent physician or surgeon, upon which a claim of negligence in a malpractice case is predicated, clearly involves and constitutes an exercise of an honest judgment, arrived at after careful and necessary investigation, and which is approved by a respectable portion of competent and reputable men of the profession, of the same school of medicine, in good standing, and there is nothing, in the judgment of the trial judge, to indicate that the approval is not honestly made or that it or the act or omission is unreasonable, and there are absent special circumstances or facts which, in the judgment of the trial judge, are such as to make it fairer to submit the case to the jury, then it is not error to direct a verdict for the defendant. This conclusion is clearly supported by and is more conservative than, the statement of the Minnesota court in Staloch v. Holm, supra—which in turn is in harmony with the holding of cases treating of the adoption of a method approved by a respectable minority—as follows:

"It would be * * * unreasonable to hold a physician responsible for an honest error of judgment on so uncertain problems as are presented in surgery and medicine. * * * Shall it be held in such cases, where there is a fundamental difference among physicians as to what conclusion their science applied to knowable facts would lead to, then what they with their knowledge, training and experience are unable to decide, and what in the nature of human limitations, is not susceptible of certain determination, shall be autocratically adjudged by twelve men in a box, or by one man on the bench, or by a larger number in an appellate court, none of whom are likely to have the fitness or capacity to deal with more than the elements of the controversy? All the court can properly do if an action for negligence should be brought in such case would be to direct a verdict for the physician."

In fact, in Bigney v. Fisher, 26 R. I. 402, the court held that if the great weight of the evidence in a malpractice case involving the exercise of judgment, is in favor of the defendant, a verdict should be directed in his favor, even though some physicians testify that the defendant's act was negligent. In Krueger v. McCaughey, 149 Ill. App. 440; Martin v. Courtney, 75 Minn. 255, the court, notwithstanding a conflict in the evidence, set aside a verdict as contrary to the weight of the evidence and granted a new trial.

We shall, accordingly, in the light of the foregoing discussion, proceed to consider the various acts of negligence charged herein, and the testimony, more or less disputed, in connection therewith. We have examined and weighed, and re-weighed the evidence. In order to curtail the length of this opinion to some extent, we may seem to have omitted some details which counsel may deem important. We have, however, attempted to mention what we consider the salient points. Whenever hereafter reference is made to the defendant, it means Dr. R. H. Reeve, party to this case.

■ Delay in Skin-Grafting.

Plaintiff charged the defendant with negligence in the following particulars:

"To graft skin on any of the burned surfaces of her body, except the portion of her left leg between the hip and the ankle. That the skin grafted upon the burned portion of the left leg between the hip and ankle was taken from her abdomen instead of from other portions of her body or from the body or bodies of another person or persons, was insufficient in quantity and was not grafted at the time the condition of the surface thereof warranted the grafting thereof, but on the contrary delayed said grafting for a long period of time after the same should have been performed, to-wit, about four months."

We shall first discuss the delay. No claim is made that such delay resulted in the permanent impairment of plaintiff's general health, nor does it appear, as will be shown later, that a different and better result could have been obtained in so far as the injured portions of her body are concerned, and the burden to show the probability of such better result was on plaintiff. Perkins v. Trueblood, 180 Cal. 437, 101 Pac. 642. It is claimed, however, and Dr. Johnson testified, that during the delay plaintiff became weaker, her recovery was deferred, and her pains would have been allayed if the skin-grafting had been done sooner, and plaintiff's contention evidently is that she should recover at least, if for nothing more, for the unnecessary pains which she suffered in the meantime.

As already stated, the undisputed testimony is that it is advisable that skin-grafting, when necessary, should be done as soon as the conditions of the wounds permit; that it is essential, however, that the wounds should be free from infection and dead portions of structure, and should have the appearance of red, normal granulation, and as Dr. Johnson testified, "the patient's general physical condition should be the best obtainable for the particular individual." The defendant himself testified in substance that while he talked to plaintiff about skin-grafting these essential conditions did not exist in the case of the plaintiff until June, 1934; that until that time the wounds were still infected; that the granulations were not healthy, and that the skin-grafts would not have taken if the operation has been performed earlier than it was; that there was, in fact, some infection in the wounds even during the trip to Chicago. No expert who testified in the case, aside from the defendant himself, saw the wounds before they were healed. Plaintiff herself was incompetent to state whether or not the wounds were free from infection. Whether or not infection exists is a

matter for expert testimony (Kater v. Woodson, (Tex. Civ. App.) 123 S. W. (2d) 981; Martin v. Courtney, 87 Minn. 197, 202, 91 N. W. 487), unless, perhaps, the patient has no temperature. But it was sought to prove unreasonable delay in skin-grafting by indirection.

Plaintiff testified that she had many conversations with the defendant Reeve about the necessity of skin grafting, commencing with March, 1934, and that the defendant told her that it was necessary to have that done. The witness Lytle testified that he had a conversation with the defendant in March, 1934, in which he stated in substance: "Yes, I am going to graft the left arm first, then her right leg, and then the left leg. I will look at the arm in the morning. I think her arm is ready to graft right away." Plaintiff's sister testified that the doctor told her that he was going to skin graft when the tannic acid crust was taken off; that around the first of March he stated that he was going to skin-graft within a day or two, first her left arm and then her right leg and then her left leg. Plaintiff's mother testified that in March the doctor stated he would look at plaintiff's arm in the morning as to skin grafting, that he would start on her arm first, and then her right leg, and then her left leg; that he stated from March on her condition was good and her temperature normal; that she talked to him about skin grafting all the time. Plaintiff further testified that the defendant told her that, aside from the burns, she was in perfect condition. But whatever statements the doctor made in regard to plaintiff's health must be taken in a relative sense. As a matter of fact, while the plaintiff may have had great power of resistance, it can hardly be said that she was in good condition. The chart of the hospital shows her pulse and temperature. It shows that her temperature was not normal, and it seems incredible that the doctor, in face of that chart, stated that it was normal. Plaintiff's pulse was

high all the time. It was seldom below 90. It was approximately 100 on the day she left for Chicago. She had fever substantially all the time. Her temperature was seldom normal. It was nearly 102 on March 22, 1934, 103 on March 26, over 102 on April 2, 101 on June 18 and 100 on the day when she left for Chicago. Her helpless condition is indicated to some extent at least by the fact that it was deemed advisable that she should be accompanied by her mother, a nurse and a physician and that she was lifted out of the Pullman car in Chicago through a window. Dr. Johnson undertook to say that because the skin was growing inward; that serum ceased to exude from the right leg and left arm; that plaintiff recommenced to menstruate soon after skin-grafting had been performed and because the grafts all took, that the resisting power of plaintiff and her health must have been excellent. Even laymen know that persons with a high pulse and a high temperature cannot be said to be in good, let alone excellent, health. These factors were not called to the attention of Dr. Johnson, and it is at least likely that he would not have stated what he did as to plaintiff's health if that had been done. Plaintiff further testified that she looked at her wounds daily; that in March the skin along the edges was growing in; that the wounds "were just raw, just like meat—hamburger. That was about the color of them too. * * When the tannic acid came off of my legs, you could see they were red * * they were just clean and nice, bright red looking burn was what it was—just like meat." Plaintiff's sister testified that some time in March, after the tannic acid coating was taken off, the wounds of her legs and arm looked bright red and just like raw meat. In view of the foregoing testimony, Dr. Johnson undertook to state in answer to a hypothetical question, that to delay the skin grafting until plaintiff was taken to Chicago was not the exercise of ordinary skill and care of phy-

sicians and surgeons in Casper; that it should have been done within approximately eight or ten weeks after the burn, as soon as the granulated surface was clear from infection. He stated further that he assumed that the wound was clear, and that he could not say whether there was actually an infection or not. On cross examination the further testimony was given:

"Q. So that, then, doctor, of course, as an experienced surgeon and physician, you wouldn't under any circumstances operate yourself, make a skin grafting operation upon the mere statement of a patient herself or of the members of the family, that upon their observation of the wound, it appeared to be red and had the appearance of raw beefsteak—would you without an examination yourself? A. I would expect to see the wound before I operated. Q. Doctor, would you expect, upon an examination of the wound, to find things possibly which escaped the eye of the patient herself, looking at it through a mirror? A. Or even her doctor. Q. You would expect to find things there too that you couldn't depend upon a layman to reveal to you? A. Yes, as well as some doctors. Q. So that the point is, that in skin grafting a burned area and in determining the time when a skin graft is indicated as proper, you, as a physician and surgeon, would have to see it yourself, wouldn't you? A. If I was going to do the grafting, I would have to see it. * * I would see it, if I did it. * * I wouldn't have operated until I saw the case, sure. * * It is very largely a question of professional judgment. * * It depends on the general nature and physical condition of the patient * * her mental condition has something to do with it. * * As to when an operation should be performed, I would have to know her physical and mental condition. I always lay considerable stress upon the patient's mental attitude and mental condition. * * I couldn't have been as clear in my opinions, if I hadn't taken into consideration what the patient told me upon my examination of her in September, 1936. * * I wouldn't have expressed the opinion I did, if it had not been for that examination."

Later, it is true, he attempted to correct the last statement, testifying that his answer to the hypotheti-

cal question did not take into consideration what plaintiff told him, but the attempted correction, in the nature of things, cannot carry conviction.

It has been held that the testimony of a witness is no stronger than as shown by cross-examination. Edwards v. Clerk, (Utah) 83 P. (2d) 1021, 1024; Porter v. Hunter, 60 Utah 222, 207 Pac. 153. That holding is particularly applicable in this case, for the testimony of Dr. Johnson on cross-examination would seem to indicate that his conclusion as to when the skin-grafting should have been performed furnishes at most but a scintilla of evidence. His testimony that he could not tell whether or not the plaintiff was free from infection; that that must be true before an operation is performed; that he would never operate unless and until he saw the patient; that the time to operate is largely a question for the judgment of the attending physician, means in substance that he did not know whether or not in this particular case the operation should have been performed earlier. Furthermore, the hypothetical question put to him included the fact that plaintiff was "sound in body and in good health." It is difficult to see, as already stated, how the plaintiff, with her high pulse, and her almost constant fever, can be said to have been in that condition. And her temperature reached 102 and 103 almost at the very time when, according to Dr. Johnson, the skin-grafting should have been performed. Moreover, Dr. Reeve testified that in April and later when he mentioned skin-grafting, the plaintiff was still very nervous and easily upset; that at times she would have nervous chills; that any unusual talk about things would make her highly nervous; that at times she would become hysterical. Plaintiff denied that she became hysterical, but her extreme nervous condition is not denied. Now, Dr. Johnson testified, on cross-examination, as already stated, that he always lays great stress on the patient's mental

condition, in order to determine the time for operation. But the hypothetical question put to him contains no reference to that whatever. Again, that question embraced the statement that "the edges of the skin around the burns were growing inward." The statement was inaccurate. It could not, in the nature of things, apply and be true as to the circular burns on the left leg—the only place where skin-grafting was ultimately found to be necessary. It might well be that wounds in the condition mentioned in this statement might be ready for skin-grafting, and wounds not in that condition might not be. These facts, thus enumerated, render the answers to the hypothetical question of little value. This is emphasized in view of the testimony of the physicians and surgeons who testified for the defendant. Dr. Drinkwater of Denver, a surgeon of 26 years of experience, and specializing in industrial surgery, and who stated that he had a case of burns on the average of every two weeks since he began his practice, testified among other things that the statement of a layman to the effect that the area proposed to be grafted was reddish and looked like beefsteak would not enable him to form an opinion as to whether there was an infection or not; that every case is unto itself; that he would not take even another doctor's opinion; that there can be infection though edges are grown in; that some physicians will not skin-graft until a microscopic examination has been made as to whether there is infection; that the fact that all the grafts took shows that the operation was performed neither too early nor too late; that when it is done too late, the grafts will not take. "From my observation of the patient day before yesterday, I would say that the treatment followed was proper treatment."

Dr. Shaffer of Douglas, a graduate of Jefferson Medical College of Philadelphia in 1925, and who examined the plaintiff along with Dr. Drinkwater, testified to a

similar effect, stating among other things that a surgeon would not do a skin-grafting until he had examined the patient himself; that it would not be possible for him, upon a report to him two years after a burn, to form any opinion as to when skin-grafting should have been done, and that the fact that all the grafts took shows that the grafting was done at the proper time. Doctors Riach and Stuckenhoff testified to a similar effect, Dr. Riach adding that the patient should be free from high fever when skin-grafting is done.

There is left then for consideration only the alleged statements of the defendant as against his positive testimony that the skin-grafting was not ready until plaintiff was taken to Chicago. And it is clear, that if the defendant can be held to be negligent in delaying the skin-grafting, the court or jury must be able to say, not only that the defendant testified falsely, but also that the wounds in fact were free from infection and free from the conditions required as conditions of skin-grafting. That the defendant told the truth is clearly corroborated by the testimony of the physicians to the effect that the result shows that the operation was performed neither too early nor too late. And if we may take as correct the statement in Kinsley v. Carravette, 244 App. Div. 213, and Dunn v. Beck, 80 Mont. 414, 260 Pac. 1047, the high pulse and high temperature of the plaintiff, concerning which there is no doubt at least at the very time when Dr. Johnson stated that the operation should be performed, is strongly corroborative, if not conclusive evidence of infection in at least a portion of the wounds at that time. Furthermore, the record shows that when skin-grafting is unduly delayed "there is formed an unhealthy, anemic granulation tissue with a scar tissue base." The testimony shows the growth of scar-tissue, but does not show that there was a growth of unhealthy, anemic tissue as mentioned. There is no evi-

dence that all scar tissue is of that nature, and if there had been a growth of anemic, unhealthy tissue, as mentioned, plaintiff would doubtless have shown that fact. So we may well assume the absence thereof, and that absence would seem to furnish strong and ample evidence that the defendant told the truth and that the skin-grafting was not unduly delayed. The only evidence tending to show the contrary, are the alleged statements of the defendant. An analysis of these statements shows them to be indefinite. The defendant spoke, it is claimed, of skin-grafting the arm, the right leg and the left leg. He did not state that all these places were ready for skin-grafting. He thought the arm would be ready right away, implying that the other places were not. He said, it is claimed, that he would begin "in a day or two," or soon, but he did not state when he would finish. Of course, the defendant may have intended to do exactly what he is alleged to have said, only to find when the time came that the conditions did not warrant him in doing so. It may well be, that, though he believed for a time that he would skin-graft the arm and the right leg, he finally determined, as he seems to have done, that it was not necessary to do so. And unless it was necessary, no negligence can be predicated on the failure to do so. It will be shown hereafter that it was not necessary. The statements that he would commence to skin-graft in a day or two, may well have referred to the operation as to these wounds. An inference that he would follow right up with the operation on the left leg is, it would seem, purely conjectural. It does not, we think, suffice as affirmative proof, which the plaintiff was bound to produce, that the left leg was in the proper condition. It is stated in 22 C. J. 300 that an alleged admission should not be considered when the subject matter to which it refers is left uncertain. The alleged statements, if made, were at best made at random. We

all know that physicians frequently make statements purely for the purpose of easing the mind of patients. They should not all be accepted as statements of a fact. The defendant did not state that the wounds were clear of infection. That fact, if nothing else, is left uncertain, and yet it was an essential fact upon which the skin-grafting was conditioned. We might add, that we are here confronted with the peculiar situation that plaintiff insists that the defendant knew the actual facts, knew that the skin-grafting should be done at once, and that he wanted to do it at once, and yet, despite all that, he deliberately or negligently delayed it for the period of three months. In view of the undisputed evidence of the great and continued care and attention which the defendant gave to plaintiff, the contention here made seems almost impossible of belief.

In a number of cases statements or admissions of physicians have been claimed to be sufficient to show negligence. Woody v. Keller, 106 N. J. L. 176, 148 Atl. 624; Quickstead v. Tevnner, 196 Minn. 125, 264 N. W. 436; Donahoo v. Lovas, 105 Cal. 705, 288 Pac. 698; Markart v. Zeimer, 67 Cal. App. 363, 227 Pac. 683; Samargian v. Stetson, 284 Mass. 510, 187 N. E. 829. The statements in these cases were much more serious and much more definite than the statements in the case at bar, but were held insufficient to show negligence. We shall not take the time and space to set out these statements. Suffice it to say that we do not think that the statements alleged to have been made in this case furnish affirmative proof of negligence, especially in view of their indefiniteness, and in view of the physical facts already mentioned.

Dr. Johnson testified that slight infection would not cause him to delay such an operation. The definite amount of infection from time to time does not appear. If we assume that the defendant should have been more specific in his testimony on that point, nevertheless,

something must be left to the judgment of the attending physician, particularly in view of the fact that it is important not to skin-graft too soon, just as much as it is important not to skin-graft too late. We do not believe under the rules of law heretofore stated, and in view of the differences of the opinions of the experts, that we can say that an error of judgment, if any, as to the *amount* of infection present insufficient to cause delay might, by the jury, be held to be equivalent to negligence.

All the testimony, including that of Dr. Johnson, is to the effect that the time of skin-grafting is largely a matter for the judgment of the attending physician, and each of them testified that he would not operate until he had personally seen the wounds. The language in Gleason v. McKeehan, 100 Colo. 194, 66 P. (2d) 808, 811, seems, accordingly, to be applicable here. The court stated:

"When the general consensus of the opinion of all physicians testifying was to the effect that the physician and surgeon then in charge must be controlled by his best judgment, then it would not lie in the mouth of any witness to condemn the exercise of such judgment when exercised by an admitted skillful or experienced physician, and especially when each witness testifying as an expert in such matters, reserved unto himself his own judgment in his cases and to proceed accordingly. * * * Had defendant adopted a different course, it would have been contrary to his personal judgment; evidence of lack of professional knowledge in such matters; and he would have been guilty of not employing his best skill and care which ultimately was to be exercised in the case in hand."

Reference is here made to the competency of the physician. Defendant in this case was a regularly licensed physician and surgeon; he is presumed to be competent, and the burden to prove the contrary was on the plaintiff. 48 C. J. 1142; Priestly v. Stafford, 30 Cal. App. 523, 158 Pac. 776; Leighton v. Seargent, 27

N. H. 460, 475. A physician is not a guarantor of cures. Incompetency is not shown by the result. Meador v. Arnold, 264 Ky. 378, 94 S. W. (2d) 626. Counsel for plaintiff make the assertion that defendant is shown to be incompetent by his alleged statements to the effect that he would first graft the right leg, then the arm and then the left leg, when in fact the left leg should have been grafted first. We cannot accept the assertion of counsel as competent evidence. In view of the character of the wounds on the left leg, and the time in which they would heal, it seems entirely reasonable that it would take longer to have them in proper condition than the wounds on the other part of plaintiff's body.

It is contended that the allegations in the second defense of the defendant to the effect that the plaintiff would not submit to skin-grafting and continued to object until shortly before July 2, 1934, corroborates plaintiff's claim. At first blush that might be considered as true. But the defendant in his first defense denied such delay. Though he was asked on cross-examination about other allegations in his answer, he was not asked about this particular one, and he might, had he been asked, have stated his views as to the claimed discrepancy. The answer was signed by his counsel. It is not certain whether he read it or not. He stated that he did not remember. Judging by the difficulty which we have had in getting the various and numerous facts herein clearly in mind, too great a blame should not be attached to defendant's counsel in that connection, if, in fact, there is a discrepancy between the first and second defense. There is none in fact. The allegations in both defenses could well be true. Considering all the facts, we doubt that we could say that the allegation in the second defense furnishes any effective corroboration of plaintiff's claim.

■ Insufficient Skin-Grafting.

The plaintiff claimed that skin-grafting should have been performed on the right leg and on the left arm, in addition to the skin-grafting on the left leg. It appears that the right leg healed much more rapidly than the left. The burns were mostly of second degree. When plaintiff came back from Chicago, the wounds both on the right leg and on the left arm were healed over, although the left arm, on account of the severity of the burns, was still very tender, so that much manipulation might have opened the wounds.

The skin grafting was left to be performed by Dr. Bryce Reeve, so that any negligence in that respect would be attributable to him, and, as will be shown later, the defendant could not be held responsible therefor. We have deemed it best, however, to discuss the charge above mentioned to some extent. There is not a great deal of testimony on the point on behalf of the plaintiff. Dr. Johnson expressed it as his opinion that the right leg and left arm should have been skin-grafted, without stating to what extent. His theory may be perfectly plain to physicians; but it is not to us, and it will be due to that if we do not state it correctly. He testified that cosmetic and functional result might have been obtained. By cosmetic result he meant that the surface should be restored so as to look as natural as possible. He did not state how the right leg looks, but we gather from other testimony that it is in as good condition as could be expected. Dr. Johnson stated that the left arm is in better condition than the left leg which was skin-grafted, so we are unable to see any negligence of the defendant so far as cosmetic results are concerned. By functional result the doctor meant the re-establishment of nature's ability to exude poison through the skin. His ideas in that connection have not been made plain. The primary aim and effect of skin-grafting, as the evidence shows,

is to aid in healing. The right leg and left arm had healed when plaintiff came back from Chicago, so that no skin-grafting was necessary for that purpose. But we conjecture—and that is all that the testimony of the witness permits us to do—that his theory is that skin-grafting would have eliminated or diminished the growth of scar-tissue, and that such scar tissue prevents exuding of poison. The theory is not developed well. It is to a partial extent corroborated by Dr. Drinkwater who stated that if it had been possible soon after the injury, and without infection present, to skin-graft, some of the scar tissue in the arm might have been avoided. He did not, however, as will appear presently, state that this would have in any way bettered plaintiff's condition. The defect in Dr. Johnson's testimony is that he did not make it clear enough for a court or jury to say that if defendant had followed his theory, the plaintiff's condition would have been bettered, and that harm resulted to her by not following it. We fail to find that he testified—so directly at least as to be understood—that there is any excess scar tissue on the left arm and right leg. He failed to state what portion thereof should have been grafted. We cannot believe that he meant that all the wounds thereon should have been grafted, for he testified that nature should be permitted to take its course as much as possible. If that is correct, it seems to follow, that the witness did not believe that harm would have resulted, if some portions of the wounds had been permitted to be covered with scar tissue, and if that is true, then the further defect in the testimony is that it is not shown that not enough natural skin has been left on the arm and right leg to permit the necessary exudation of poison.

The physicians who testified for defendant stated that whenever a muscle has been destroyed by burns, in whole or in part, scar tissue is bound to grow to

replace the tissue destroyed. The growth thereof is so inevitable that, according to Dr. Stuckenhoff and Dr. Beach, if the scar tissue which grows first is cut out, new scar tissue will grow to take its place. Furthermore Dr. Stuckenhoff testified that "the formation of scar tissue in the left arm was not a degenerative change; that it is healing." All the physicians, except Dr. Johnson, stated that there is no undue amount of scar tissue, and that skin-grafting would have made no difference, because as stated by Dr. Stuckenhoff, "the scar is deeper than the skin." These physicians were emphatically of the opinion that whenever possible, nature should take its course, and no skin-grafting should be done except where it is necessary. Dr. Drinkwater, for instance, testified:

"The burned areas which were not grafted were healthy, thickened, as you would expect, but very little discoloration, and particularly nice appearing in the lower right leg. The area not grafted is better in appearance than the grafted area. In case of burns, it is proper procedure, if the area can be bridged to always avoid skin-grafting. From my observations I made of the patient I would say that the result could not have been obtained from skin-grafting these areas (left arm and right leg) as well as they are now. There were no areas upon Mrs. Smith's body not grafted which ought to have been grafted."

It does not appear that there is a generally accepted and standard method which should have been adopted in this case. Dr. Johnson's opinion was but an opinion, and his testimony indicates that his thoughts on skin-grafting cannot be accepted blindly. He testified, for instance, at length about taking the grafts from a person other than a patient, seemingly attempting to convey the idea that that should have been done in this case, but finally admitted on cross-examination that to take the grafts from plaintiff was proper. Again he insisted throughout his examination that the grafts

should have been taken from the right thigh. And plaintiff charges negligence by reason of the fact that they were taken from the abdomen. That charge is not well taken, if for no other reason than that no harm resulted from the method adopted. State for use, etc., v. Hospital (Md.) 10 Atl. (2d) 614. The testimony shows that the plaintiff was so severely injured on her left side that she could not lie on that side, and the only rest from lying continually on the back was by lying on her right side. To take the grafts, then, from the right thigh would have deprived plaintiff of that means of rest, and that does not appear to be reasonable. True, the plaintiff testified that Dr. Schaeffer, called into consultation by Dr. Bryce Reeve, stated that the grafts should be taken from her right thigh. But it also appears that plaintiff was then insisting that they should not be taken from her abdomen. The statement of Dr. Schaefer, if made, would, it seems, find sufficient explanation in that fact.

In view of the fact, according to the unanimous opinion of the physicians, including that of Dr. Johnson, that nature should ordinarily be permitted to take its course, it would seem that the extent to which skin-grafting should be done is clearly a matter of judgment. Five physicians, three from Casper, one from Douglas and one from Denver testified that the extent of skin-grafting done in this case was sufficient. There is nothing in the testimony, not even in that of Dr. Johnson's (aside from his bare statement of opinion) which indicates that the course of treatment or the approval thereof is unreasonable. In fact nothing appears which would indicate that a different course of treatment would have produced better results. We think, accordingly, that the court was right in applying the rule of law heretofore mentioned. In Staloch v. Holm, supra, it was stated, though by way of obiter dicta, that whether to operate or not is a matter of

judgment, and that the determination on that point should not be classed as malpractice. It would seem that that should be true as to the extent of the operation in the case at bar, at least under the circumstances and evidence appearing herein.

■ **Left Arm.**

The plaintiff charged the defendant Reeve with negligence in the following particular:

"To place the left shoulder, arm and hand in such a position by the use of cast, splint or other means and to manipulate the same from time to time as occasion would require to keep up circulation therein, prevent atrophy of muscles and to restore same to their normal use, positions and functions."

It is somewhat hard, under the evidence in the case, to determine just the extent of the complaint in the foregoing particulars. It relates, as we understand the record, to the time before plaintiff went to Chicago. Counsel for plaintiff have set out the evidence upon which they rely in bulk, and have not favored us with any argument on the separate acts of negligence upon which they rely, except, to some extent, on the testimony relating to skin-grafting. We fail to find any specific evidence indicating any negligence relating to the hand, the limitation of movement of which seems to be attributable to destruction of nerve supply caused by the burns. The testimony on behalf of plaintiff on the foregoing charge relates to the shoulder and the arm. Dr. Johnson, on behalf of plaintiff, testified that the limitation in the movement of the shoulder is due mainly to the burning of the muscles in the arm. Counsel for the defendant, accordingly, argue that it does not appear that the elbow is stiff (which is true) and that all the evidence of Dr. Johnson relating to the arm is purely academic. We are not certain about that, and shall consider the subject to some extent. The

main complaint appears to be the limitation of the movement of the arm upward. It can, it seems, be brought up to a right angle, approximately ninety degrees "straight from the shoulder," but no further, while the ordinary ability to move it is from 20%, as testified by some of the witneses, to 50% greater, as testified by Dr. Johnson. The plaintiff testified that her arm was bandaged every day, and placed upon her chest, medicaments being used every day on the burns, which, of course, indicates manipulation to some extent. The witness Constance Axlund, the night nurse, testified that the left arm was changed a little from time to time and moved so as to make it more comfortable for plaintiff; that it was moved back and forth (indicating) either up a little more or down a little more, and that it rested on her chest on a pillow. Dr. Johnson testified that it was not good practice to let the arm rest on the chest; that it should have been kept straight along the body, in a splint or on a board; that if held in the position in which it was, the growing scar tissue would be apt to make it stiff in that position; that there is no other objection; that if the arm had been held out straight, the scar tissue would be stiff, but the arm would have more opportunity for motion; that there would be an opportunity to double the arm up; that if held as it was, the inability to straighten the arm out, due to the harder pressure against the soft tissue would control the activity of the arm; that the arm should have been exercised all the time so as to make the scar tissue elastic; that he did not know when the manipulation should have begun; that the attending physician (or the patient) would be about the only person who would know. Asked about the appliance above plaintiff's head—the rod across it with a hook on it—he expressed his opinion, that it should not have been as high as it was, so that it could have been used in connection with manipulating her

arm. The defendant Reeve testified that the burns on the arm made satisfactory progress, but that it was exceedingly sore for a long time; that it had to have rest to let the healing get started; that when it started to heal, the nurses were instructed to give passive motion to it as much as possible, and to encourage her in some active motion herself; that it was exposed about thirty minutes a day to encourage healing; that to follow the ideas of Dr. Johnson would be about the worst treatment which an arm could receive; that there would be a danger of having a stiff arm extended and that this would be a catastrophe; that the muscles of the arm were burned and could not be replaced and that the condition of the arm as it now is could not be prevented. "I did not choose to leave the arm permanently crooked." "To have applied a splint of any kind under the burns, would have been too painful and too severe for the patient." Asked about the appliance over the bed, he stated: That it was not the purpose thereof to manipulate her arm. "Why that girl couldn't even move that arm at all without a lot of pain. She complained of it at all times, even when I would touch it, or the nurse would. * * It (the left arm) had too deep a burn to try and exercise it. We would try and get her to move it as much as possible." Dr. Drinkwater testified that there was nothing in the shoulder itself which would cause the limitation of the movement of the arm; that this limitation is due to the scar tissue deep down in the arm, caused by the burns, and that the limitations in the hand appear to be due to an impingement of the nerve. He did not approve the thought of Dr. Johnson in letting the arm rest straight along the body, stating that "if you would hold an arm out and have it become stiffened in that position, you have practically a useless arm for most all purposes. The arm put at right angles is comfortable and an arm extended is not. The arm extended with a burn on it

would be very uncomfortable." Dr. Shaffer testified that the scar tissue was caused by the deep burns, and that it is the cause of the limitation of movement in the arm, since it does not have the elasticity of ordinary skin; that he would not have advised, nor would it have been proper, to stretch the arm and exercise it; that it depends on the judgment of the attending physician as to when manipulation should have been undertaken, and that a physician who had not seen the patient could not form any opinion on that point. The other physicians testified similar in effect, Dr. Riach adding that "if the skin was healing in from the edges and that was a healthy, normal granulation that appeared like red beefsteak, then the thing to do was to let it alone—it was healing satisfactorily, and not do anything more than just support it by dressings or appliances to keep from irritating the surface or abrading the surface by rubbing on or striking against the bed clothing and protect it from infection."

Analyzing the testimony as a whole, we are unable to see, in view of the fact that the elbow is not stiff, that placing of the arm on the chest is at all material or is the cause of the limitation of the movement in the arm—which seems to be the equivalent of the lack of movement in the shoulder. The effect on the shoulder would depend as to how far the arm would be placed to the right of the body. If placed in the middle—right and left—it would not be affected at all. The evidence does not show how far to the right it was placed. The limitation of movement is due primarily, as even Dr. Johnson testified, to the deep burns, since all burns cause contraction of the muscles, and secondarily to the inelasticity in the scar tissue which was formed in the arm. This tissue is not, naturally, elastic, but apparently may be made so to a limited extent, and, as Dr. Johnson testified, it should be "made as elastic as possible" by manipulation. It would seem to be clear

that the arm could be manipulated just as much when placed on the chest as when placed straight along the body. Dr. Johnson as well as the other physicians testified that when manipulation should begin depends on the judgment of the attending physician. Hence no negligence is shown in that respect. And we can readily perceive that it would have been painful to have placed the arm, with its severe burns, in the position mentioned by Dr. Johnson. Plaintiff was in a serious condition, and defendant was bound to take that fact into consideration in determining his treatment. Hazen v. Mullen, 32 Fed. 324. There was danger, as Dr. Johnson himself stated, that if the arm had been kept straight along the body, the elbow might have become inflexible. No definite and generally accepted method of treatment as to placing the arm seems to exist. The physicians testifying for the defendant differed with Dr. Johnson. So far as we can see there is nothing unreasonable in their opinion. Where the arm should be placed was, under the evidence, clearly a matter of judgment. No carelessness in carrying out the course adopted was shown, and we think, accordingly, that the rule of law heretofore mentioned might well be applied in connection with the subject here discussed.

### As to the Left Foot.

The plaintiff charges that the defendant Reeve was negligent in the following particular:

"To properly support her left foot by splint, cast or other means and to manipulate the said foot from time to time as occasion would require to keep up circulation therein, prevent atrophy of muscles and ankylosis of the left ankle, and to restore same to their normal uses, positions and functions."

The saddest fact in the case is the condition in which the left foot is left, which has also an indirect effect on the spine. The plaintiff, it seems, will never be able

to walk without crutches. Her left foot is dropped. By that is meant, in this case, that plaintiff cannot get her heel to the ground by about 4 inches; the toes hang lower to that extent. In other words, the foot hangs at an angle, instead of wholly on the ground in its natural position. The muscles and the tendo achillis— the tendon on the back of the lower leg—were partially destroyed by the burns, and all burns, as shown by the testimony, result in the contraction of the muscles. Dr. Johnson testified:

"There is a stiffening of the structures about the left ankle joint that keeps it from having its full motion back and forth, like a hinge, or the rotary motions sideways. * * In my opinion the reason of the foot-drop is the destruction of muscle fibers in the muscles and the destruction of fascia that helps to hold the muscles and tendons together, and flexing the tendons from the inflammation produced from the burns. * * There would inevitably be—assuming some destruction—a contraction of that tendon (tendo achillis). If the contraction of the tendo achillis was all there was, it would have a tendency to draw the toe down. The partial destruction of the tendo achillis would result in contraction and that considered by itself would inevitably tend to bring the heel up and throw the toe down. The destruction of the muscles in the calf of the leg would have the same effect, would tend to accentuate the contraction, and to assist the partially destroyed tendo achillis to pull the heel up and throw the toe down. That would produce the foot drop if there was no support."

He also testified that the plaintiff has a curvature in the spine, and expressed it as his opinion "that it was caused by the shortening of the muscles and structures of the leg, and the inability to raise the toe so the heel may reach the floor, throwing the pelvis out of line, and producing an 'S' condition of the spine." He stated that:

"In my opinion, if the skin-grafting had been undertaken at the proper time and the foot supported at that

time, it would not have dropped. * * In order to assist the healing processes and to keep the foot in a normal position, there should have been prompt transplanting of skin across the ankle * * and also a grafting of strip skin on the back of the leg over the tendo achillis, on both sides, so as to avoid the scar tissue on the back over the tendo achillis. * * The destruction of the muscle fiber, the fascia, the flexing of the tendons, the inflammation produced by the burns, and the failure to support the foot, keeping it at right angles to the leg, was responsible for the foot drop that is now present, and not the destruction of the tissues alone in the left leg."

The primary cause, then, of the foot-drop was, even according to the testimony of Dr. Johnson, the partial destruction of the muscles and fascia by the burns. He believed, however, that the skin grafting would have assisted in the healing, and—apparently—would have avoided the scar tissue or part thereof, in the back of the tendo achillis. He admitted on cross-examination that the function of the skin is not to strengthen but merely to serve as a covering. His theory, however, seemingly is that if the burns, by the aid of skin-grafting, had healed while the foot had been kept in an upright position, sufficient strength would have been given to, or left in, that part of the muscles not destroyed which would have prevented the foot-drop. Unfortunately, he did not discuss or mention some of the physical facts which seem to make his opinion untenable. The testimony of the physicians who testified for the defendant, including the defendant himself, was to the effect that the foot-drop was inevitable from the beginning, and that earlier skin-grafting or supporting the foot in an upright position, at right angles with the body, had nothing to do with it. The undisputed testimony in the case is that muscles and fascia, or part thereof, once destroyed by burns, cannot be restored, at least so far as their strength is concerned; that the muscles in the front of the leg and the muscles

in the back (including the tendo achillis) pull against each other, regulating the position of the foot, the former holding up the toes and the latter the heel; that, accordingly, the drop of the foot, either before, during or after healing, depends entirely upon the relative strength left in the respective muscles in front and in the back; that the muscles in the back are stronger than the muscles in the front; that hence their pulling power is greater. Dr. Drinkwater testified—and there is no testimony to the contrary—that if the muscles are injured both in front and in the back, the weight of the foot itself would have a tendency to drop the foot down. In view of this undisputed testimony, Dr. Johnson's theory seems to be of doubtful value. He did not explain his mention of the scar tissue in the back of the tendon, and we shall not attempt to conjecture his meaning.

If we understand Dr. Johnson, the skin-grafting would be only of an accessory nature, i.e., to help in healing. He seems to place the ultimate cause of the foot-drop in the failure to keep the foot in proper position, while the plaintiff was in the hospital in Casper. So, without reference to what we have said, we shall briefly discuss the testimony relating thereto. The testimony on behalf of plaintiff is meager. After stating that her leg was left straight on a pillow, plaintiff testified: "Q. I want to ask you if anything was done with reference to your left foot while you were in the hospital in Casper? A. There was nothing done with my left foot." On cross-examination her testimony was: "Q. It is true, isn't it, that from the time you were taken to Memorial Hospital up to the time you were taken to Chicago, your foot was supported with pillows all the time and the nurses were constantly being careful to keep your foot supported in a position approximately at right angles with your leg? A. That is not true." Plaintiff's sister testified as follows: "Q.

And how about the left foot, if you observed anything about that? A. It wasn't moved. Her left leg was on a couple of pillows just laying on it. It was a little bit softer than the bed, but I didn't see anything else." Constance Axlund, the night nurse, testified:

"Her left leg was supported with pillows under the thigh and under the calf of the leg, and her heel was supported by what we term a doughnut. A doughnut is a round piece of something made so there is a hole in the middle, so her heel can rest without touching the bed or without pressure on the heel. During all that time her foot was kept in an upright position—in a position at right angles to the limb itself. Pillows were placed in support of the sole of the foot, and with some sand bags to hold the pillow, and the pillow and sandbags rested on the foot of the bed. During the time I was there, her foot was constantly kept in that position."

The nurse Mrs. Frisch testified:

"The left leg would be supported on pillows or pads in a position like that (illustrating). The pillows or pads were placed from the thigh to the knee and from the knee to the foot. The pillows were never put directly under the knee; that was a very painful area. A blanket was rolled and put at the foot of the bed and the left foot rested on it with cotton padding between that and the foot of the bed to keep the foot in an upright position. The heel of the left foot was supported on a blanket rolled up, and there was also what we call a doughnut under the heel on top of the blanket. For a cotton doughnut you take cotton and roll it, and leave an indentation in it for the heel so as to take the pressure off of the bottom of the heel. I would say her heel was kept about six inches above the level of the mattress, enough to keep the leg perfectly straight. The front part of the foot was at right angles to the leg. That was done by placing cotton pads or a cotton pad behind the foot, and between that and the foot of the bed. That foot was maintained there all the time."

The defendant Dr. Reeve testified similar in effect. It seems that the nurses, whose business it was to know

what was done, and who, by reason of their profession actually knew what was done, would hardly invent the detailed story such as they told. On the other hand the sister of the plaintiff would hardly know what was actually done, nor would she have an opportunity of knowing the details, unless she was there at the dressings of the plaintiff. Plaintiff herself was at all times in great pain, and would hardly, without knowing what ought to be done, observe the actual treatment. Nor did she attempt to state what was actually done. Her denial that the foot was kept straight, at right angles, at all times, was general. However that may be, the undisputed testimony shows that the foot had not dropped until after plaintiff had gone to Chicago. If the opinion of Dr. Johnson is correct that only a foot not properly supported will drop, it would seem to follow that the physical fact that the foot had not dropped until after she had gone to Chicago, shows conclusively that the foot had been properly supported previously, leaving the testimony of Dr. Johnson without support in so far as it relates to the period when the plaintiff was in the hospital in Casper. We take it, that it is not claimed that the left foot should have been manipulated during that time, since the undisputed testimony is that such manipulation would have been too painful during that time, and for a long time thereafter.

The foot-drop occurred while the plaintiff was in Chicago, under the care of Dr. Bryce Reeve, a brother of the defendant Reeve herein, and the physician and surgeon employed by the Standard Oil Company at that place. It is claimed that the brother of the defendant Reeve was selected by the latter and so became his assistant, and hence is liable for his negligence. 46 C. J. 1136, and Bolles v. Kinto, 83 Colo. 147, 263 Pac. 26, 56 A. L. R. 814 are cited. The Colorado case is not in point. It is stated in 48 C. J. 1136:

"A physician, who merely arranges for an operation by another not his associate, employer or employee, and lends casual assistance at the operation, is not jointly liable for the negligence of the physician operating. * * * A physician who, because of intended absence or other reason, is unable or unwilling to assume or continue the treatment of a case, and recommends or sends another physician, is not liable for injuries resulting from the latter's want of skill or care, unless the recommended physician is in his employment or is definitely his agent, or is his partner, or unless due care is not exercised in making the recommendation or substitution."

In note 46 A. L. R. 1455, where many of the cases are collected, it is stated that "there are few instances where a physician or surgeon is held liable for damages, caused by no fault at all of his own, but entirely by the fault of another. 21 R. C. L. 393." The testimony shows that it was thought advisable to have the skin-grafting done by some one else than the defendant Reeve. Plaintiff testified that the defendant mentioned the fact that she could go to Mayo's at Rochester, Minnesota, or to Chicago; that the trip to Chicago would be easier on the plaintiff on account of the change necessary to be made, and the necessary waiting in Omaha. Dr. Reeve made all arrangements. Plaintiff was taken to Chicago, attended by the defendant Reeve, Miss Bezold who had been the day nurse of the plaintiff, and by her mother. When they arrived in Chicago, she was placed under the care of Dr. Bryce Reeve, and the defendant left Chicago the next day for his home in Casper, and plaintiff did not again come under his care until her return from Chicago about two months later. There is no evidence that Dr. Bryce Reeve was either the agent, partner, employer or employee of the defendant; nor is it shown that he is not a competent physician and surgeon. Both were employed by the Standard Oil Company, and if any relation existed between them, the former was the superior of the de-

fendant. Plaintiff had her choice to go to Mayo's. She did not take that choice. She stated later in her testimony that she was given no choice. But nothing appears from which it might be inferred that the defendant Reeve used any coercion. It is perfectly clear that if plaintiff had chosen to go to Mayo's, their negligence, if any, could not have been charged to the defendant. We see no reason to do so, when plaintiff chose to go to Chicago. She naturally followed the advice of the defendant. That is usual in such cases. But she did not need to take it. Besides, her mother was with her, indicating all absence of coercion and of any unusual action on the part of the defendant. He testified that plaintiff was given her choice to go to Mayo's or to Chicago; that she chose the latter place, to be under the care of Dr. Bryce Reeve, who had been assistant to the Medical Director of the Standard Oil Company, and was then acting Medical Director. We do not think that what the defendant did constituted anything more than a recommendation to go under the care of Dr. Bryce Reeve. To construe the acts of the defendant, such as shown herein, as imposing upon him the risk of everything done by another physician, would, it seems, discourage all acts either of duty or of kindness of an attending physician who finds his patient in a situation in which he deems it best that, in his or her interest, he or she go under the care of another physician in a larger city. That seems to be particularly applicable in the case at bar. The defendant received no compensation for what he did from the plaintiff. Mr. Beard testified that his company wanted to give plaintiff all the advantages possible, and all the testimony in the case bears that out. It appears that Dr. Bryce Reeve, at the behest of the defendant, came to Casper in the spring of 1936 to examine the plaintiff, and it is contended that this fact corroborates the claim that he was employed by the defendant. At that time,

the defendant's brother was the Medical Director of the Standard Oil Company. The contention does not appear reasonable. We fail to see in this visit anything more than an anxiety of the defendant to do everything that he could for the plaintiff.

We are unable to say whether plaintiff claims, under the evidence, that the defendant Reeve was guilty of any negligence in his treatment of plaintiff's foot after she came back to Casper from Chicago. There is no medical testimony as to any want of care. We have already stated in a general way the treatment which she received. Plaintiff testified that the foot bothered her "hanging like that. I wanted them to brace it up or do something with it, because it bothered me dangling like that." She admitted, however, that Mrs. Frisch tried to bring the toe up and straighten it; that she rubbed and massaged the left foot and ankle; that Mrs. Eschwig, too, worked on her left leg, exercising and massaging the left ankle which controls the movement of the foot and applying passive motion to it. She complained that the doctor did not put on the cast until November 30, 1934. Dr. Reeve explained that. In any event no harm has been shown to have resulted from the delay. It was put on, it seems, mainly for the purpose of straightening the knee. That was accomplished. We have already stated why a second cast was not put on. Dr. Reeve testified that no passive motion could be applied for some time after plaintiff came back from Chicago, because it was too tender, but that later on he instructed that passive motion be applied, and that pads and sandbags be used to help in trying to bring the foot up. Mrs. Eschwig, who succeeded Mrs. Frisch as nurse, testified that she applied passive motion to the left foot; that she would work it until the plaintiff would get tired; that she would work it up and down and massage it; that the foot was very tender and she had to be careful in the

application of passive motion thereto. Mrs. Grierson, who succeeded Mrs. Eschwig as nurse, testified that she was instructed to, and did, apply passive motion to the left foot, without hurting it, and that Dr. Reeve told plaintiff of the necessity therefor; that at first she couldn't move it at all, but that it limbered up a little later. Mrs. Carter testified that she tried to manipulate or bend and work the left ankle in the spring of 1936; that it was tender and plaintiff objected to the manipulation. We are unable to see, under the evidence, that plaintiff has shown that the treatment now under consideration was negligent, and that everything that could reasonably and beneficially be done was not done.

### ■ Admission by Silence.

Counsel for plaintiff argue that the plaintiff's case is corroborated by the following matter, which, it is claimed, was alone sufficient to take the case to the jury. Plaintiff testified that when she arrived in Chicago and was in the hospital, with Dr. Bryce Reeve, brother of the defendant Reeve, and the defendant, the following took place:

"Doctor Bryce Reeve asked his brother when the accident took place. The defendant Reeve said, 'January 15th.' Dr. Bryce Reeve asked 'And she hasn't been skin grafted?' And the defendant Reeve answered 'No.' Dr. Bryce Reeve then said 'I always skin-graft three weeks after the accident, right after I take off the tannic acid; she is in a terrible shape.' And he looked at my legs and arm, and he tried to lift up my left arm and tried to straighten it, and he said 'I don't know what in the name of God you mean by having her in that condition. If I had been taking care of her, she would have been on her feet before this.' Dr. Bryce Reeve was talking about the position my leg and arm was in. 'Now,' he said, 'We will have to go ahead and get her all straightened out.' The defendant doctor made no reply. When the defendant doctor was leaving, Dr. Bryce Reeve stated: 'The only thing I can give

you credit for doing in Wyoming is keeping her wounds clean.' The defendant Reeve made no reply."

Plaintiff was corroborated in the last statement by her mother. The conversations were denied by the defendant Reeve; that in the hospital on the evening of plaintiff's arrival in Chicago was also denied by Miss Cherne, a nurse, who is admitted by plaintiff to have been present. Plaintiff also admitted that her left arm and her legs were bandaged, and the bandages were not removed that evening. This whole conversation, though doubtless introduced by counsel in good faith, was, in effect, but an attempt to introduce in evidence the expert opinion of a surgeon not on the witness stand. If the defendant Dr. Reeve had denied the statements of Dr. Bryce Reeve, so far as they related to him, clearly, we should have before us but a dispute between two experts, not made in court, and the dispute would not have been admissible in evidence. If, then, the testimony was admissible at all, it was by reason of the silence of the defendant Reeve. As to whether silence may amount to an admission depends on the circumstances. The situation must be such as to call for a reply. So it seems that if the statement is made by a stranger to the suit, one is not ordinarily required to reply. 1 R. C. L. 478; 20 Am. Jur. 480; State ex rel. v. Ellison, 266 Mo. 604, 622. The court in the case just cited, a malpractice suit, considered the subject at length, and stated among other things as follows:

"In fact, under the weight of general authority evidence of this character is considered to be so weak in probative force that it is rarely ever admitted. The circumstances must point very clearly to the necessity for reply, before it can be admitted at all. The books look upon it (admission by silence) as the weakest of all evidence in probative force."

We think it is far from true that it is clear in this case that the statements of Dr. Bryce Reeve, if made

as claimed, required an answer on the part of the defendant Reeve. The statement that plaintiff was in a terrible condition was, of course, true. And it is not at all unlikely that Dr. Bryce Reeve stated that he would have to straighten plaintiff out. Why not encourage the plaintiff, as other doctors do? But let us examine the other statements. The statement that he always skin-grafted within three weeks after the burn was a simple statement of fact which required no answer. It was wholly immaterial what he always did and was inadmissible as against the defendant. Rytkonen v. Lojacono, 269 Mich. 270, 274. Furthermore, the unanimous testimony of the physician was that they would first want to examine the burns before determining when skin-grafting should be performed, and that the wounds must be free and clear of infection. How could Dr. Bryce Reeve know whether that had been true, even without examining the wounds? Moreover, Dr. Johnson testified that plaintiff should have been skin-grafted between 8 and 10 weeks after the burn. So that we are here met by the paradox that on the one hand Dr. Bryce Reeve was sought to be presented to the jury as an expert of knowing when the skin-grafting should have been performed, and on the other hand, plaintiff convicts him of ignorance even out of the mouth of her own physician—Dr. Johnson. The talk the next morning that the defendant Reeve only kept the wounds clean, again would seem to indicate that so far as the skin-grafting was concerned, it was not too late.

Most of the conversation on the evening of the arrival in Chicago was, according to the plaintiff, in reference to the condition of plaintiff's arm and left leg. They were bandaged at the time, and it is not explained how Dr. Bryce Reeve could have formed any reliable judgment concerning them without examination. And the simple answer to it all seems to be that

when plaintiff left Chicago, her arm and leg, aside from the skin-grafting, was in no better condition, or much better condition, than when she went there. The foot had dropped, which was not true when she went to Chicago. His statements, then, if made, consisted of nothing but boasts, made ridiculous in view of the results which he himself obtained. His inability to better plaintiff's condition of the arm and leg—aside from the mere grafting—seems to prove, if anything, that his brother's treatment could not have been far wrong. We may add that the defendant Reeve was not in Chicago to engage in any dispute with his brother. He was there to see that plaintiff received due care. She, it is clear, was in bad physical condition. It would have been folly for the defendant Reeve to have engaged in any dispute with his brother under the circumstances. See further the cases already cited on admissions of physicians which were held not to show negligence.

■ Non-production of Witnesses.

Counsel for plaintiff also argue that Susan Bezold, who was plaintiff's day nurse from the time of the injury in January 1934 until plaintiff was taken to Chicago, Dr. Bryce Reeve, who performed the skin-grafting operation on plaintiff, Dr. Schaeffer, who examined the plaintiff in Chicago, and Dr. Packard, who examined the plaintiff in Denver, should have been produced as witnesses in the case by the defendant Reeve, and that the failure to do so raises the presumption that they would have testified unfavorably to the defendant on the matters within their knowledge. Jones v. Wettlin, et al., 39 Wyo. 331, 271 Pac. 217, is cited. We discussed that case to some extent in the recent case of See Ben Realty Co. v. Gothberg, and what we said in that case applies in the case at bar. We fail to see how the Wettlin case has any application here. There is no undisputed testimony in this case as

there was in that. A number of physicians examined the plaintiff at her request. Most of them were not witnesses in the case. It would be just as reasonable to invoke a presumption against her for the non-production of them as witnesses, as it would be to invoke a presumption against the defendant Reeve as claimed by counsel for the plaintiff. Defendant had all of plaintiff's nurses as witnesses. Only Miss Bezold was not present. The reason does not appear. But Mrs. Frisch was able to testify to the treatment which plaintiff received while Miss Bezold, the day nurse, attended her. We can find no possible reason why the plaintiff could not have taken the depositions of Dr. Schaeffer of Chicago and of Dr. Packard of Denver, or of Miss Bezold. The mere fact that the defendant Reeve consulted Dr. Packard is no excuse. And Dr. Schaeffer had no connection with the defendant Reeve at all. It might have looked better if the defendant had had his brother as a witness. He had a number of physicians who testified on his behalf, including one from Denver. The defendant, or his counsel, possibly thought that on account of the relationship, the testimony of Dr. Bryce Reeve would not have been of great help. The record indicates that his deposition was taken. It does not appear what became of it.

In this case the trial court was in several respects in much better position to judge of the effect of the testimony in this case than this court, since the plaintiff was on the witness stand and showed, to some extent, the wounds which she received and the result thereof, and of the treatment received, and many of the witnesses showed what they meant by physically indicating it. So that it would seem that what was stated by the Supreme Court of the United States in Patton v. Texas & P. R. R. Co., 21 Sup. Ct. 275, 276, is apropos:

"The judge is primarily responsible for the just outcome of the trial. He is not a mere moderator of a

town meeting, submitting questions to the jury for determination, nor simply ruling on the admissibility of testimony, but one who in our jurisprudence stands charged with full responsibility. He has the same opportunity that jurors have for seeing the witnesses, for noting all those matters in a trial not capable of record, and when in his deliberate opinion there is no excuse for a verdict save in favor of one party, and he so rules by instructions to that effect, an appellate court will pay large respect to his judgment."

We think that we are not justified in holding that the trial court was wrong in directing a verdict for the defendant Reeve.

The respective counsel herein have argued as to whether or not a separate action lies for malpractice, when compensation has been awarded under the workman's compensation act, as is true in this case. The conclusion which we have reached, as above mentioned, makes it unnecessary to decide that question, or to pass upon the rulings as to pleadings, involving the same or similar points. A few other errors are assigned. We have examined the contentions in reference thereto. It must suffice herein to say that we deem none of the contentions of sufficient importance to require reversal of the judgment herein, even if well taken.

The judgment of the trial court is, accordingly, affirmed.

*Affirmed.*

RINER, Ch. J., and KIMBALL, J., concur.